[Civ. No. 28515.   Second Dist., Div. Two.   Mar. 2, 1966.]

LEO TEICHNER, Plaintiff and Appellant, v. HARRY KLASSMAN, Defendant and Respondent.

Zerner & Sims and Edward S. Sims for Plaintiff and Appellant.

Benjamin J. Goodman and Hubert R. Sommers for Defendant and Respondent.

HERNDON, J.—Appellant filed several separate actions to recover moneys which he had advanced to respondent for the purpose of financing the operations of the Embassy Club, a poker club in Gardena, California, of which respondent was the sole proprietor.

These actions were consolidated for trial since they were brought to recover successively accruing installments allegedly due and owing to appellant from time to time pursuant to the provisions of certain writings which purported to set forth the terms and conditions of appellant's advancements and respondent's obligations to repay them. The apparent com-

plexity of this case is attributable very largely to the heteromorphic nature of these instruments and to the doubtful character of the legal relationships thereby created.

## The Determinative Issue

Reduced to its simplest terms, the principal question presented to us by this appeal is this: Did the trial court err (1) in reaching its decision that the instruments and transactions here involved were designed and intended to evade the law governing the exaction of usurious interest, or (2) in computing the amount of the principal which appellant is entitled to recover? With respect to the major issues involved in this case, we find no error in the record and hold that the evidence supports the findings and the judgment.

## The Written Instruments

On July 3, 1956. respondent, then allegedly the sole proprietor of said Embassy Club, contemporaneously signed and delivered to appellant four instruments providing as follows: (1) ''Loan No. 7357.

''This is to certify that on 3 July 1956, Leo Teichner, loaned to the Embassy Club Sixty-Five Hundred Dollars ($6500.00), payable at the rate of One Hundred Fifty Dollars ($150.00) per month for forty two (42) months and Two Hundred Dollars ($200.00) on the forty third (43) month until paid. The initial payment shall begin on 15 July 1956 and continue on the fifteenth of each following month until paid.''

(2) ''This agreement entered into this day of 3 July 1956, between Harry Klassman DBA Embassy Club and Leo Teichner, is understood as follows: ''Harry Klassman DBA Embassy Club acknowledges the receipt of Sixty-Five Hundred ($6500.00) Dollars, loan from Leo Teichner as indicated by that certain note no. 7357 dated 3 July 1956. It is understood by both parties Harry Klassman and Leo Teichner, that in the event of the permanent closing of the Embassy Club that that note No. 7357 dated 3 July 1956, shall be cancelled and Harry Klassman shall be held harmless and is not responsible for further payment of said note. In the event of default of payment of said note the full balance of said note shall become due and payable and all costs incurred in collection of said note shall be payable by Harry Klassman.''

(3) ''This is to certify that for the sum of One Hundred ($100.00) Dollars, I Harry Klassman sell, transfer and assign to Leo Teichner, one unit or point in that limited partnership known as [the Embassy Club]. This sale is to be consummated upon final payment of that certain note No. 7357, Dated 3

July 1956, loaned to the Embassy Club by Leo Teichner. In the event of my death or demise I direct my heirs or executors to carry out in its entirety the terms of this agreement."

(4) "In the event of the sale of the Embassy Club, the terms of the note and purchase of that certain point shall be accepted by the buyers of the Embassy Club or the option to either continue these agreements or sell said agreements under the following terms and shall be exercised by Leo Teichner.

"Terms as follows: Complete payment of Note No. 7357 amount Sixty-Five Hundred ($6500.00) Dollars and all revenue derived from sale of that certain point mentioned in that certain document to be purchased at a later date."

Thereafter, on November 13, 1957, appellant and respondent entered into two further identical written agreements that provided as follows:

"This agreement entered into this 13th day of November, 1957, by and between Harry Klassman dba "The Embassy Club" and Leo Teichner or assignees, located at 180 So. Vista Street, Los Angeles 36, California.

"For the sum of Sixty-Five Hundred ($6500.00) Dollars, which is to be invested in the Embassy Club, receipt of which is hereby acknowledged by signature of Harry Klassman, Leo Teichner or assignees are to receive the sum of One Hundred and Thirty ($130.00) Dollars per month, commencing on December 15th, 1957, and each subsequent 15th of each and every month, as long as The Embassy Club is in existence.

"In the event of the closing of The Embassy Club, Harry Klassman does hereby indemnify and guarantee that the difference between the amount received by Leo Teichner or assignees, and the sum of Sixty-Five Hundred and 00/100 ($6,500.00) Dollars, shall be reimbursed to the above-mentioned Leo Teichner, or assignees. Upon receipt of the amount of Sixty-Five Hundred and 00/100 ($6,500.00) Dollars, Leo Teichner or assignees hereby release Harry Klassman from the above mentioned guarantee, but shall continue to receive the sum of One Hundred and Thirty ($130.00) Dollars each and every month, so long as The Embassy Club shall remain in existence.

"In the event of the sale of The Embassy Club, the new owners shall be notified and shall be bound by the terms of this Agreement.

"Leo Teichner or assignees, their assigns or heirs, are to be held harmless from all debts incurred by The Embassy Club, all tax liabilities, (State and Federal), law suits, and specifically any and all liabilities encumbered by The Embassy

Club. In the event of any law suits, or damage suits, Harry Klassman guarantees that the abovementioned Leo Teichner or assignees will be held harmless at all times.

"The $6,500.00 invested in The Embassy Club shall be known as one (1) unit, or one percent (1%) of the total ownership of The Embassy Club, and in the event Leo Teichner or assignees should desire to sell this one (1) unit, the right of first refusal shall be given to Harry Klassman, and he shall have the right upon refusal to approve the purchaser of said unit.

"In the event of the complete sale of The Embassy Club, 1/100 of the net sales price shall go to Leo Teichner or assignees if they at that time elect to sell, or the new owner shall be bound by this Agreement.

"In the event of the death of Harry Klassman, his heirs, assigns or executors shall carry out in full the terms of this agreement."

Finally, on October 30, 1960, appellant and respondent entered into another written agreement essentially identical to those of November 13, 1957, quoted above, except that appellant advanced the sum of $26,000 and the number of "points" or "units" referred to were four instead of one.

### Respondent's Payments

Respondent made the monthly payments required by these several agreements, with certain minor exceptions which the parties stipulate amounted to $615, until September 15, 1961. It is agreed that of the total amount of $45,500 advanced by appellant, respondent repaid $26,515, i.e., $9,225 on the July 3, 1956 loan of $6,500; $5,785 on each of the November 13, 1957 loans of $6,500, and $5,720 on the October 30, 1960 loan of $26,000. In addition, the trial court credited respondent with further payment in the amount of $3,916.12 as the result of attachments made by, and released to, appellant in connection with his several actions.[1]

### Decision of Trial Court

Having heard the evidence, the trial court determined that these transactions constituted a series of usurious loans and entered judgment in appellant's favor for $15,068.88, being the difference between the total sum advanced by appellant and the total sum credited to respondent by way of repayment. It is from this determination that appellant appeals,

---

[1] Of this total of $3,916.12, appellant actually received only the net sum of $3,724.50, as $191.62 was expended as costs.

contending, in essence, that the trial court erred in failing to find these several transactions to be good faith loans in which either the repayment of principal or the payment of interest was subject to a hazardous contingency and therefore were without the purview of the usury laws.

As stated in *Gruner* v. *Barber,* 207 Cal.App.2d 54, 57 [24 Cal.Rptr. 292] : ''We find ourselves immediately presented with the oft-repeated and time-honored rule that when a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. (*Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289].) ''

In the instant case, the trial court found that the various ''points'' or ''interests'' in the Embassy Club purportedly transferred, or to be transferred, in connection with the several transactions entered into between the parties were securities within the meaning of the Corporate Securities Law. Since no permit had been secured from the Commissioner of Corporations for the transfer of these securities, the agreements relating thereto were void.

In addition, the court expressly found that the several loans and purported transfers of percentage interests in the club were ''entered into by the [appellant] and [respondent] with the intent on the part of each of them to evade the usury laws of the State of California and for the purpose of usurious interest on said loan.''

### The Case of the Appellant

The evidence introduced herein consisted of the documents themselves and the testimony of respondent. Appellant did not testify, apparently choosing to rely upon the prima facie case made out by the various instruments admittedly executed by respondent and the stipulation regarding the amounts of respondent's payments. Such reliance was not unreasonable as shown by the following quotation from *Giorgi* v. *Conradi,* 199 Cal.App.2d 82, 85 [18 Cal.Rptr. 588], adopted by this court in *Wooton* v. *Coerber,* 213 Cal.App.2d 142, 145 [28 Cal.Rptr. 635] :

''Whether a business transaction is usurious depends on its own facts. The presumptions are that such transactions have

been fair, regular and legal [citations]. It is a question of fact as to whether a particular transaction is or is not usurious [citation]. Where, as here, the form of the transaction makes it appear that to be nonusurious, it is for the trier of fact to determine whether the intent of the parties was that disclosed by the form adopted, or whether such form was a mere sham and subterfuge to cover up a usurious transaction [citation]. The burden is upon the one who charges the extraction of usurious interest to prove his charges by a preponderance of the evidence [citations]."

### Respondent's Testimony

However, in the instant case respondent testified clearly and emphatically that it was at all times the intent of both parties to arrange a loan that would provide for interest at a usurious rate. In substance, respondent's testimony produced a picture of himself as a man seriously in need of money who expressed his willingness to pay interest in excess of the legal rate when appellant indicated his unwillingness to enter into any transaction that would produce no greater return than that allowed by law.

Respondent's description of the arrangement of the parties indicates an understanding that he would make payments on the loans on an "interest only" basis with no definite time fixed for repayment of the principal. For example, he testified that while he was willing to pay appellant 25 percent interest on the first loan, he had objected to the $150 per month interest demanded by appellant and had agreed thereto only by reason of his then urgent need for funds. At the time of the later loans, however, his need was not so great and he therefore refused to pay more than $130 per month interest and appellant agreed to this "reduction," i.e., regarded as an "interest only" loan, the payments of $150 a month on the $6,500 principal amount to approximately 27.7 percent interest, while the $130 payments on the same sum amount to only 24 percent interest.

### Appellant's Theory

Appellant expressly adopts the position that he is only a creditor with no ownership interest in the club and tacitly concedes that his loans anticipate a return greater than that allowed by law, but argues that since respondent's obligation to make the payments provided for by the several written agreements would cease if the Embassy Club were to be permanently closed, such contingency permits the receipt of sums in excess of the highest permissible rate of interest. In support

of this contention, he relies upon the authorities cited by this court in *Wooton* v. *Coerber, supra,* 213 Cal.App.2d 142, at page 148, and quoted at length in the concurring opinion at pages 156-157. However, such reliance is misplaced because it ignores the important qualifications placed upon the rule therein set forth. Thus, the following cited authorities are clearly limited in their application as shown by the following italicized portions:

"Restatement of the Law of Contracts, section 527, at page 1024, and comment (a) thereon, are as follows: 'A promise, made as the consideration for a loan or for extending the maturity of a pecuniary debt, to give the creditor a greater profit than the highest permissible rate of interest upon the occurrence of a condition, is not usurious if the repayment promised on failure of the condition to occur is materially less than the amount of the loan or debt with the highest permissible interest, *unless a transaction is given this form as a colorable device to obtain a greater profit than is permissible. In that case it is usurious.*

" 'Comment: a. Usury laws do not forbid the taking of business chances in the employment of money. A creditor who takes the chance of losing all or part of the sum to which he would be entitled if he bargained for the return of his money with the highest permissible rate of interest is allowed to contract for greater profit. *On the other hand it is not permissible to use this form of contract as a device for obtaining usurious profit.* If the probability of the occurrence of the contingency on which diminished payment is promised is remote, or *if the diminution should the contingency occur is slight as compared with the possible profit to be obtained if the contingency does not occur, the transaction is presumably usurious.'*

"6. Williston on Contracts (rev. ed.), section 1692, page 4786: 'It is not usury to advance money which is to be repayable only on a contingency, even though the sum that will be repaid if the contingency happens exceeds the amount loaned with legal interest, *if the transaction is genuine and not used as a mere cover to carry out a usurious intent.'*

"55 Am.Jur., section 32, page 347: 'To constitute usury it is essential that the sum loaned shall be repayable absolutely; if it is payable only upon some contingency, then the transaction is not usurious, although to satisfy this requisite it is not necessary that the borrower assume personal liability for the loan. However, the rule that if the principal sum is repayable only upon some contingency, then the transaction is not

usurious, is not applicable where the contingency selected is so improbable as to convince the court or the jury that there was no real hazard and *that the repayment of the loan was made subject to an improbable contingency merely to escape the statute against usury. Where such is the case, the transaction will be treated as usurious.'*

"91 C.J.S., section 25, page 599: 'Where the principal sum lent or any part thereof is put in hazard, the lender may lawfully require for the risk incurred as large a sum as may be *agreed on in good faith.* When, for any cause whatever, the principal sum lent or any part thereof is put in hazard, the lender may lawfully require for the risk incurred as large a sum as may be *agreed on in good faith.* . . . When the loan is absolutely repayable and only the security for its repayment is at hazard, an interest charge in excess of legal rates is usurious.'

"This settled rule of law has been accepted and applied in this state. 49 Cal.Jur.2d, section 63, page 735: 'The advancing of money as a hazardous investment in an enterprise must be distinguished from the advancing of money as a loan, and the former is outside the purview of the usury law.' 1 Witkin, Summary of California Law (7th ed.) section 170, page 185: '(5) *Principal Payment Contingent.* Where the *principal sum* is subject to business hazards, and repayment of the loan is subject to the contingency of profits being earned, there is no usury. [Citations.]

" '(6) *Interest Payment Contingent.* Where the payment of the full legal interest or any part of it is subject to a contingency, so that the lender's lawful profit is wholly or partially put in hazard, the interest need not be limited to the legal rate, *if the parties are contracting in good faith and without intent to evade the usury law.'* " (Italics added.)

## Sufficiency of the Evidence

We have examined the record herein and conclude that the evidence is sufficient to sustain the trial court's finding that the transactions here entered into between the parties were conceived and formulated with the express purpose and intent to evade the usury law. Moreover, even if we were to accept appellant's contention that the conduct of the parties should be interpreted as indicative of an arrangement in which appellant might conceivably have lost his principal investment in the July 3, 1956, transaction and his interest or profit in the other transactions in the event that gambling clubs had been outlawed in the City of Gardena by legislative action either at

the local, county or state level, nevertheless we would not hold that the trial court necessarily should have regarded this risk as great enough to require respondent or his successors in interest to continue to make these monthly payments *indefinitely* so long as the club remained in business as demanded by appellant.

█ The fact that appellant introduced evidence that respondent had entered into similar transactions with others is not demonstrative of error on the part of the trial court. ''It can readily be admitted that, under proper facts, the defense of estoppel is applicable to a charge of usury in this state. [Citations.] But these same cases establish that the borrower and lender are not *in pari delicto* in a usurious transaction, and that an estoppel does not arise simply because the borrower knew of the usurious nature of the transaction, took the initiative in seeking the loan, and paid usurious interest without protest. [Citation.]'' (*Janisse* v. *Winston Investment Co.*, 154 Cal.App.2d 580, 587 [317 P.2d 48, 67 A.L.R.2d 225].)

### Other Issues Rendered Moot

In view of our determination on this fundamental issue, it becomes unnecessary for us to pass upon appellant's contention that he was not *in pari delicto* with respondent in the matter of obtaining a permit to issue the ''securities'' involved. Similarly, since the trial court had found that respondent was not required to perform in accordance with the terms of the usurious contracts entered into between the parties, it was unnecessary to determine whether or not such contracts were binding upon respondent's present partners in the business.

In addition, it follows from our conclusion regarding the nature of the risks involved herein that the trial court committed no prejudicial error in refusing to receive evidence or to take specific judicial notice of the several legislative actions that have been instituted in the past looking to a closure of poker clubs in Gardena.

Finally, the trial court's determination that the mechanics and forms of all these transactions were merely devices designed to evade the usury law rendered it unnecessary for the court to make the additional findings requested by appellant. They sought unnecessary interpretations of specific detail or parts of the sham framework.

### The Matter of Costs

█ Appellant also cites as error the ruling of the trial

court that each party should bear his own costs herein. He relies upon section 1032 of the Code of Civil Procedure which provides that costs are allowed, as of course, to a plaintiff upon a judgment in his favor in an action for the recovery of money. Respondent has failed to reply to this contention in his brief on file herein and we believe it to be meritorious.

The law is clear that even though a contract be tainted with usury, the lender is entitled to a return of his principal. (49 Cal.Jur.2d, Usury, § 14, pp. 676-677, and cases cited.)

In the instant action, although appellant's complaints were phrased in such a manner as to constitute claims for the installments due under the several contracts without designating them as either principal or interest, we believe the trial court correctly construed them as comprehending demands for whatever sums of money appellant was then entitled to receive. Respondent, on the other hand, was resisting the payment of any sums whatsoever under his affirmative defenses and counterclaims, contending that all sums previously paid as interest should be allocated to principal and to treble damages allowable on such payments as were made within one year preceding the filing of the respective actions.

By its judgment entered herein, the trial court allowed respondent's counterclaims to the extent that it applied all payments made to reduction of the principal indebtedness, including even the excess payments made on the July 3, 1956, agreement. It refused, however (apparently under the reasoning enunciated in *White* v. *Seitzman*, 230 Cal.App.2d 756 [41 Cal.Rptr. 359]), to allow respondent credit in the penalty amount of three times the payments made. Since respondent has taken no appeal from the judgment, or any part thereof, its overall effect is identical to that which obtains in the more typical case where each party recovers all or a substantial part of his demand.

It is well settled that in such a situation, the party to whom the "net result" of the judgment is favorable is allowed his costs as of course. (*Moss Constr. Co.* v. *Wulffsohn*, 116 Cal.App.2d 203, 205 [253 P.2d 483]; *Wilkinson & Co.* v. *McKinley*, 84 Cal.App.2d 100, 106-107 [190 P.2d 35], and cases cited therein.) Such result should not be different where, as here, both parties have joined in the violation of the usury law and where the lender's recovery has been restricted to the principal sum advanced.

Of course, the trial court does have broad discretion under section 1033 of the Code of Civil Procedure to disallow un-

necessary costs, but this should be done upon a motion to tax costs rather than by a complete disallowance thereof. Since appellant might have achieved a complete determination and satisfaction of his claims by means of filing supplemental pleadings in his original superior court action (*Strickler Co.* v. *Eisner*, 5 Cal.App.2d 441, 443 [42 P.2d 1065]), his costs may well be restricted to those that would have been incurred in that manner. The costs which he incurred by his repeated filings of separate actions for successive installments may be disallowed if the trial court should determine that such successive filings were unwarranted.

### Interest

In view of the decision that the transactions here involved were usurious, the trial court properly refused to award any interest on the principal amount of the loans for any period prior to the entry of judgment.

### Appeal From Order
### Discharging Attachments

In addition to the assignments of error presented by appellant upon his appeal from the judgment itself, he filed separate notices of appeal from the minute order discharging his attachments and from the subsequent formal written order signed by the court to the same effect. Since the minute order did not expressly direct that a further written order be prepared, the minute order itself was the proper subject of appeal and the subsequent appeal taken from the written order may be dismissed as redundant. (Rule 2(b), California Rules of Court; *Lea* v. *Strebe*, 201 Cal.App.2d 227, 230 [20 Cal.Rptr. 20].)

All of the attachments levied herein were actually released shortly after their levy by respondent's deposit of cash with the attaching officer in an amount sufficient to satisfy appellant's demands. (Code Civ. Proc., § 540.) The sums thus available in the hands of the attaching officers at the time the judgment was entered herein *are less than will be required to satisfy this judgment as entered.* Therefore, 'despite the fact that appellant, as plaintiff, appealed from the judgment as entered,[2] it was unnecessary for him to post an appeal bond to maintain these attachments since the total amount sequestered

---

[2] Somewhat paradoxically, in the instant case the amount of the judgment that appellant contends should have been entered in his favor under his theory regarding the transactions *is less than that actually entered.*

thereby was less than the amount to which he would be entitled if the judgment were affirmed.

The undertaking required by section 946 of the Code of Civil Procedure is designed to provide security "that the appellant or moving party will pay all costs and 'damages which the respondent may sustain *by reason of the attachment, in case the order of the court below be sustained in favor of the respondent or against the moving party*; . . ." (Italics added.)

Through his appeal appellant does not seek to continue an attachment on property of a value in excess of that required to satisfy the judgment. Hence, respondent can suffer no recoverable damage by reason of the attachments. The order discharging the attachments was therefore erroneous. (Code Civ. Proc., §§ 553, 946; *Stockton Theatres, Inc.* v. *Palermo,* 47 Cal.2d 469 [304 P.2d 7], and 51 Cal.2d 346 [333 P.2d 10].)

The judgment is modified by adding to it the sum of $191.62, which was the amount credited to respondent although actually retained by the attaching officer and not received by appellant, resulting in a total judgment of $15,261.50, and by awarding appellant his taxable trial court costs. As thus modified, the judgment is affirmed. The order of February 21, 1964, discharging attachments is reversed. The appeal from the order of February 27, 1964, is dismissed. Each party shall bear his own costs on this appeal.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied March 21, 1966, and appellant's petition for a hearing by the Supreme Court was denied April 27, 1966.