In re John Franklin HEIN and Brenda Marilyn Hein, Debtors.

John Franklin HEIN and Brenda Marilyn Hein, Plaintiffs,

v.

James R. BOBBITT, Trustee for American Electric Contracting Corp. Pension Trust Defined Benefit and Money Purchase Pension Plan, Defendant.

Adv. No. C82–1029–P11.
Related Case No. 81–00829–P11.

United States Bankruptcy Court, S.D. California.

May 16, 1986.

N. James Richardson, Karp & Richardson, San Diego, Cal., for plaintiffs.

Joe N. Turner, Higgs, Fletcher and Mack, San Diego, Cal., for defendant.

## MEMORANDUM OPINION

JOHN J. HARGROVE, Bankruptcy Judge.

### I.

### INTRODUCTION

At issue is an action for declaratory relief initiated by the debtors regarding the rights of the parties under a loan contract. Specifically, the debtors request this court to declare that the 20% interest rate charged under the note violated the usury provisions of the California Constitution and Civil Code and that a $500 a day late charge in the note constituted a "penalty" and was therefore unenforceable under the California Civil Code.

By way of background, on March 17, 1981, the debtors, John Franklin Hein and Brenda Marilyn Hein ("Hein"), filed for protection under Chapter 11 of the United States Bankruptcy Code ("Code").

On April 23, 1981, secured creditor James R. Bobbitt, Trustee for American Electric Contracting Corp. Pension Trust Defined Benefit and Money Purchase Pension Plan ("Bobbitt") filed a Complaint for Relief from Automatic Stay under 11 U.S.C. § 362 ("relief from stay proceeding"). The relief from stay proceeding concerned a loan from Bobbitt to Hein in the amount of $475,000 given on June 26, 1980. The loan was evidenced by a promissory note and was secured by vacant real property consisting of approximately 4.82 acres located at the intersection of Broadway and East Main Street in El Cajon, California ("Broadway and Main property"). The security consisted of a deed of trust in third priority.

While Bobbitt's relief from stay proceeding was pending, Hein initiated the instant adversary proceeding against Bobbitt on June 4, 1982.

After several hearings in the relief from stay proceeding, the court modified the automatic stay to permit a trustee's foreclosure sale of the Broadway and Main property on or after October 8, 1982. Thereafter, on November 10, 1982, by Order of the court entered in the relief from stay proceeding, and by stipulation of the parties, Hein paid Bobbitt the sum of $475,-000 in repayment of the principal on the Bobbitt loan and interest thereon at the rate of 18% per annum from June 26, 1980 through November 10, 1982, the date of

payment. The interest payment totalled $202,825. Bobbitt also received reimbursement of his trustee's fees and costs, together with other sums he had advanced to a senior noteholder on the Broadway and Main property. The cash became available to Hein as a result of a court approved sale of another piece of real property owned by Hein, known as the "UTC" property.

Over strenuous objection from Bobbitt, Hein was permitted by the court on October 31, 1984 to amend his Complaint to assert that he was excused from any obligation to pay late charges by reason of Bobbitt's failure to give notice in writing of his intention to assess late charges.

This case came on for trial before this court, sitting without a jury on December 10, 11, 13, 19, and 23, 1985, and on January 28, 1986.

## II.

## FACTS

John Hein is a self-described "professional investor".[1]

In 1979, Hein owned several parcels of unimproved real property in San Diego County. During the same year, Hein became acquainted with Robert J. Pancheri ("Pancheri") when Pancheri purchased a parcel of unimproved real property from Hein known as Jamacha Village located in El Cajon, California. Hein also became acquainted with Jack K. Jaynes ("Jaynes"), a real estate broker, during the same transaction. Jaynes represented Pancheri as Pancheri's broker in the transaction and received a real estate commission from Pancheri for his participation as broker in the Jamacha Village sale.

After the Jamacha Village transaction, Hein, Pancheri and Jaynes became involved in another real estate transaction in the fall of 1979, when Hein purchased a 70 acre parcel of unimproved real property located in Santee, California. Pancheri assisted

Hein by providing Hein with a $400,000 loan funded partly by a group of investors and partly by Pancheri. This property was commonly referred to as the "Cuyamaca parcel". Pancheri, as representative of his investors, took a promissory note and second trust deed ("Pancheri trust deed") as security for the loan on the heretofore described Broadway and Main property. Thereafter, Pancheri and Hein, with the assistance of Jaynes who represented Pancheri as his broker, entered into an escrow whereby Pancheri would purchase the Cuyamaca parcel from Hein. For his services as a broker, Jaynes, upon the close of escrow was to receive an interest in the Cuyamaca parcel, either as a partner or limited partner. The transaction was apparently a net transaction to Hein. Hein was not a participant in the transaction between Pancheri and Jaynes. The escrow on the Cuyamaca parcel opened but never did close.

When Hein purchased the Cuyamaca parcel he gave the sellers a purchase money promissory note and deed of trust in the approximate sum of $300,000 which was all due and payable to the sellers some 90 days later on or about January 2, 1980. When Hein failed to pay the note, the sellers instituted non-judicial foreclosure proceedings on February 27, 1980. Additionally, during November and December, 1979, Hein borrowed, either directly from Jaynes or from others through loans arranged by Jaynes, the approximate sum of $100,000 for living expenses.

During the same period and continuing through 1980, Hein and Jaynes came into close and frequent contact with each other, most often in Jaynes' real estate office, where they would meet and discuss strategy regarding the various properties owned by Hein. Jaynes testified that Hein used his real estate brokerage office as his "base camp" on an almost daily basis.

---

1. Although both John Franklin Hein and Brenda Marilyn Hein jointly filed their Chapter 11 Petition, the evidence adduced at trial reveals that John Franklin Hein, was at all times the participant debtor in the various transactions involved in this lawsuit. Therefore, the debtors will collectively be referred to as "Hein" in this opinion.

During the period January to May, 1980, Hein negotiated the purchase of an approximately 3.9 acre parcel of unimproved real estate located at the intersection of Miramar Road and Genesee in San Diego, California and previously referred to in this Opinion as the UTC property. Jaynes represented Hein in the negotiations for the purchase of the UTC parcel and introduced Hein to bank officers of La Jolla Trust and Savings Bank which provided the funds for Hein to purchase the UTC property. As compensation for his services as a broker, Jaynes received a 10% limited partnership interest in the UTC parcel from Hein when the sale closed on or about May 8, 1980. Jaynes received cash for his 10% interest when the UTC parcel was sold in November, 1982 during the underlying chapter 11 proceeding with the approval of the court.

Sometime during May, 1980, Pancheri, who was also a pension plan administrator, informed Hein and Jaynes that one of the pension funds, which he had administered, had a large certificate of deposit which was coming due during May of 1980. Pancheri indicated that the cash from the certificate of deposit might be available to solve Hein's financial problems in connection with the pending foreclosure on Hein's Cuyamaca parcel. Bobbitt, the president and sole shareholder of American Electric Contracting Corp. ("American Electric"), was the trustee for American Electric's pension funds which were administered by Pancheri. Bobbitt desired to use the pension funds from the certificate of deposit for a trust deed investment which would pay a higher interest rate than would a certificate of deposit. Pancheri contacted Bobbitt and advised him that a large trust deed investment was available and Bobbitt informed Pancheri that he had the sum of $475,000 available for a 2 year period.

Hein testified that he learned about the possibility of the Bobbitt loan from Jaynes while he was in Jaynes' real estate office working with Jaynes on the purchase of the UTC property. Hein stated that Jaynes told him that he had received a call from Pancheri advising Jaynes that he had someone with money for Hein. There followed a series of phone calls relating to the amount, interest, late charges and terms of the note.

Hein testified that he never met Bobbitt personally during the negotiations but may have spoken to him once by phone. The testimony of Hein, Jaynes and Pancheri confirms that almost all of the negotiations regarding the Bobbitt loan were handled by Jaynes by phone in Jaynes' real estate office. On most occasions, Hein was present when Jaynes was involved in phone discussions with Pancheri concerning the terms of the Bobbitt loan. The scenario regarding the Bobbitt loan consisted primarily of Jaynes speaking by phone to Pancheri from Jaynes' office regarding terms and conditions of the loan followed by Pancheri then communicating to Bobbitt by phone and then back to Jaynes who would then communicate the various loan terms to Hein. Hein further testified that he never discussed any of the terms of the Bobbitt loan transaction with an attorney. He also testified that he needed Bobbitt loan proceeds in order to pay off the $300,000 note on the Cuyamaca parcel and also for living expenses for his family. He testified that he thought that the $500.00 a day late charge provision in the note requested by Bobbitt was large but felt that the sale of the Cuyamaca parcel to Pancheri would close and that he would therefore have sufficient proceeds to pay the Bobbitt loan on a timely basis thereby avoiding the necessity of paying any late charges. Hein also testified that he, Jaynes and Pancheri discussed Bobbitt's request that Pancheri subordinate his $400,000 Trust Deed on the Broadway and Main property to Bobbitt's new Trust Deed securing his loan to Hein.[2] Hein and Jaynes both testified that Jaynes prepared and took care of providing Grossmont Escrow Company, the escrow agent

2. Although the reasons were not specifically discussed at trial, apparently Bobbitt wanted the security for his loan to attach to the Broadway and Main property and not the Cuyamaca parcel.

for the loan, with information for the escrow instructions.

Attorney Richard A. Gant ("Gant") testified that Bobbitt, who had been his client since approximately 1978, told him about the terms and conditions of the loan and indicated that Jaynes would call him to make an appointment with him so that the loan could be discussed and Gant could make sure that "everything was fine". Gant testified that he had two and perhaps three meetings with Jaynes at Gant's law offices and that he reviewed the promissory note, an appraisal on the Broadway and Main property and a preliminary title report. He indicated that he had little discussion or negotiation with Jaynes about the amount of the loan, the interest rate, or the $500 a day late charges. He indicated that the only item in controversy was the timing of the frequency of the interest payments under the note. Hein wanted the interest payments to be paid yearly and Bobbitt wanted them paid quarterly. Gant also testified that he was concerned with the 20% interest rate and discussed the 20% interest rate with Jaynes and specifically, the recent Amendment to the California Constitution article 15, § 1, commonly known at the time as "Proposition 2" because of its appearance on a state election ballot. Gant also testified that in response to his questions, Jaynes confirmed that he had represented Hein in the past as a broker in many transactions and that he was involved with him in several pending escrows and that he was acting as a broker to arrange the loan from Bobbitt.

The Bobbitt loan to Hein funded on June 27, 1980, five days before the scheduled foreclosure sale on the Cuyamaca parcel. Pancheri received a $25,000 finder's fee from Hein for his participation in the transaction. The finder's fee was paid outside of the loan escrow. He did not share the $25,000 with anyone else. Jaynes received the sum of approximately $103,000 from the loan escrow, which sum represented repayment to Jaynes of loans from Jaynes to Hein and loans arranged by Jaynes for Hein. None of the monies received by Jaynes from the loan escrow constituted a commission for his participation in the transaction.

## III.

### DISCUSSION

The parties stipulated in the jointly signed Pretrial Order that the following issues of law and equity and no others remain to be litigated:

1. Whether the Bobbitt loan to Hein was usurious as provided in California Constitution article 15, § 1.

2. Whether Bobbitt is precluded from recovery of interest from June 26, 1980 to June 26, 1982, and whether Bobbitt is entitled to interest at the legal rate from June 26, 1982 to November 10, 1982 because the loan to Hein by Bobbitt violates the usury laws of the State of California.

3. Whether the late charge provision should be struck down as a penalty pursuant to California Civil Code § 1671 or was a valid provision for liquidated damages.

4. Whether Bobbitt is entitled to any of the other sums for which Mission Escrow reserved funds pursuant to the Court's order of November 11, 1982.

5. Whether Hein is precluded from denying liability for the sums sought by Bobbitt under the doctrine of unclean hands, estoppel, or res judicata.

6. Whether Bobbitt is denied recovery of any amount for late charges due to unclean hands or any failure of Bobbitt to give any notice required under the law of the State of California.

7. Which party is the prevailing party within the meaning of California Civil Code § 1717.

8. Whether either party should be awarded any other and further relief.

Although this case and the instant adversary proceeding were filed prior to the effective date of the Bankruptcy Amend-

ments and Federal Judgeship Act of 1984 (Pub.L. No. 98–353 (1984)), this court may hear and determine this proceeding as a proceeding related to a case under Title 11 of the United States Code pursuant to 28 U.S.C. § 1334 and § 157.[3] The parties have consented to jurisdiction under 28 U.S.C. § 157(c)(2) by written stipulation. Accordingly, this court will enter an appropriate order, subject to review under 28 U.S.C. § 158.

### A. *Propriety of Interest Charge.*

■ Bobbitt contends that his loan to Hein is not usurious by virtue of statutory and constitutional provisions of California law exempting loans "made or arranged" by real estate brokers.[4] Hein counters this contention by asserting that the broker exemption did not apply in this case inasmuch as the broker did not receive any compensation for his participation in the loan transaction.

Applied to the facts in this case, the California Constitution article 15, § 1, in pertinent part prohibits the charging of interest in excess of five (5) percent above the prime interest rate established by the Federal Reserve Bank of San Francisco prevailing on the 25th day of the month preceding the earlier of the date of execution of the contract to make the loan or the date of the making of the loan.[5]

The note was executed on May 29, 1980. The Federal Reserve "Discount Rate" on the date was 12%. Therefore, the maximum interest that Bobbitt could have charged Hein was the 17%, unless one of the exemptions under the California Usury Law applied.

In support of his position that the real estate broker exemption regarding usurious loans does not apply in this case, Hein relies heavily on *In re Lara*, 731 F.2d 1455 (9th Cir.1984). In *In re Lara* Mr. and Mrs. Lara wished to borrow money to refinance an existing loan. With the help of Mrs. Lara's brother, they were put in touch with a Mr. Gary Zager, who was a licensed estate broker. As a result of Zager's participation, the Laras received a loan of $17,500. Zager loaned half of the $17,500 on funds that he borrowed from a bank. The other half of the loan to the Laras came from a friend of Zager's. The Court of Appeals concluded that the portion of the loan funded by Zager was exempt under California Constitution article 15, § 1(2) because it was "made" by a licensed real estate broker. However, the Court of Appeals found that the portion of the loan funded by Zager's friend was not exempt as Zager did not receive compensation for bringing the friend into the transaction and that therefore the friend's portion of the loan was not "arranged" by a licensed estate broker.

By statute, a real estate broker is defined in pertinent part as:

". . . a person who, for a compensation . . ., does or negotiates . . . for another or others: (d) [S]olicit borrowers or lenders for or negotiates loans for . . . in

---

3. Applicable to pending cases. Pub.L. No. 98–353, § 122(a) (1984).

4. California Constitution article 15, § 1(2) states:
"However, none of the above restrictions shall apply to ... [A]ny loans made or arranged by any person licensed as a real estate broker by the State of California and secured in whole or in part by liens on real property...." *Cal. Const.* article 15, § 1(2).

5. California Constitution article 15, § 1(2) states in pertinent part:
(2) For any loan or forbearance of any money, goods, or things in action for any use other than specified in paragraph (1), at a rate not exceeding the higher of (a) 10 percent per annum or (b) 5 percent per annum plus the rate prevailing on the 25th day of the month preceding the earlier of (i) the date of execution of the contract to make the loan or forbearance, or (ii) the date of making the loan or forbearance established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act as now in effect or hereafter from time to time amended (or if there is no such single determinable rate of advances, the closest counterpart of such rate as shall be designated by the Superintendent of Banks of the State of California unless some other person or agency is delegated such authority by the Legislature). *Cal. Const.* article 15, § 1(2).

connection with loans secured directly or collaterally by liens on real property or on a business opportunity." *Cal. Bus. & Prof.Code* § 10131(d) (West Supp.1986).

California Business and Professions Code § 10131 was amended in 1984, after *In re Lara,* to add the emphasized portion of the introductory paragraph, as follows:

"A real estate broker within the meaning of this part is a person who, for a compensation or in the expectation of a compensation, *regardless of a form or time of payment,* does or negotiates to do one or more of the following acts or acts for another or others:

. . . . .

(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or from business opportunities." (emphasis added). *Cal. Bus. & Prof.Code* § 10131 (West Supp. 1986).

. . . . .

The Legislative Counsel's Digest, found in Chapter 177 of the 1983–1984 Regular Session of the California Legislature, comments with respect to the amendment that: "This Bill would amend the definition to specify that the form or time of payment of the compensation not be considered as an element of the definition." 5 Cal.Legis. Serv., Chp. 177, pp. 209–210 (West 1984).

In 1985, § 1916.1 of the California Civil Code was amended to read as follows: "SECTION I. Section 1916.1 of the Civil Code is amended to read:

1916.1. The restrictions upon rights of interest contained in Section I of Article XV of the California Constitution shall not apply to any loan or forebearance made or arranged by any person licensed as a real estate broker by the State of California, and secured directly or collaterally, in whole or in part by liens on real property. *For purposes of this section, a loan or forebearance is arranged by a person licensed as a real estate broker*

*when the broker (1) acts for compensation or in expectation of compensation for soliciting, negotiating or arranging the loan for another, . . . .*

. . . . .

The term "made or arranged" includes any loan made by a person licensed as a real estate broker as a principal or as an agent for others, and whether or not the person is acting within the course and the scope of such license." (emphasis added). *Cal.Civ.Code* § 1916.1 (West Supp.1986).

Hein contends that because Jaynes did not receive any compensation from the transaction for his involvement in negotiating the loan with Bobbitt, then Jaynes like broker Zager in *In re Lara* did not "arrange" the loan within the scope of his license and that accordingly, the loan was not exempt from the California usury prohibitions.

It appears to this court that under the most restrictive reading of § 10131 of the California Business & Professions Code § 1916.1 as recently amended effective January 1, 1986 of the California Civil Code and *In re Lara* the following facts would have to be shown to bring the Hein loan within the usury exemption:

(1) That Jaynes was a licensed real estate broker;

(2) That without the activities of Jaynes the loan would not have been made;

(3) That Jaynes performed a function for which a license is required by the California Business & Professions Code;

(4) That Jaynes acted for compensation or in the expectation of compensation, regardless of the form or time of payment; and

(5) That the activities in which Jaynes participated constituted the soliciting, negotiating or arranging the loan for another.

In reviewing the facts in this case it is undisputed that Jaynes was a licensed California real estate broker having been so licensed since 1970. Additionally, Jaynes testified that he obtained a law degree in

1966 but had not passed the California State Bar examination. It is also clear to this court that Jaynes was more than a mere "finder" in this case.

As discussed previously in this opinion, almost all of the phone calls regarding the transaction occurred from Jaynes' real estate office and were between either Bobbitt, Pancheri or Bobbitt's attorney, Gant. Further, Jaynes was involved in the loan negotiations from their inception to their completion. It was also very clear from the testimony adduced, that Hein participated in only a few of the phone calls regarding the terms and conditions of the loan. In addition, Jaynes met with Bobbitt personally, met with Gant on at least two or three occasions and also met with the escrow officer at Grossmont Escrow Company, to set up the escrow instructions relating to the loan. Finally, it was also very clear from the testimony that Jaynes was the person principally involved in negotiating with Attorney Gant the frequency of the interest payments and, in fact, was able to change the due date of the interest payments to yearly installments vice quarterly installments.

With reference to the issue of compensation, Hein contends that the compensation required to be paid the broker, for the broker to be acting within the scope of his license under California Business & Professions Code § 10131, must arise directly from the loan transaction. Hein asserts that the language "regardless of the form" merely means that the compensation may be in various forms, i.e. money, property, securities, etc. and that the language "regardless of time" is self-defining.

Bobbitt contends that compensation or expected compensation need not come from the loan transaction. He states that Jaynes' purpose in seeking loan funds for Hein was for the purpose of facilitating other transactions, to wit the Cuyamaca escrow between Hein and Pancheri and the Broadway and Main escrow between Hein and Pancheri in which Jaynes could reasonably expect compensation for his services as a broker if those two sales closed.

Jaynes, in fact, conceded that the purpose of the Bobbitt loan was to prevent the foreclosure of the Cuyamaca parcel which was the subject of an escrow which would generate broker's compensation to Jaynes if the Cuyamaca sale escrow closed. Additionally, Jaynes admitted that the seeking of the loan funds for Hein from Bobbitt was related to the Cuyamaca and Broadway and Main parcels sale transactions in which he had an interest for his compensation as broker.

This court holds that Hein's reliance on *In re Lara* as applied to the factual situation in this case is misplaced. In *Lara*, the loan was a one time transaction. Further, the facts in *Lara* do not reveal any previous or continuing relationship between the principals and the broker. Finally, the broker in *Lara* represented both the borrower and the lender in consummating the loan.

In the present case, Jaynes only represented Hein. Bobbitt was represented by his attorney, Gant. Jaynes negotiated exclusively on Hein's behalf and successfully negotiated the interest payment date in Hein's favor.

Additionally, testimony from the escrow officer at Grossmont Escrow further confirms that Jaynes expected compensation for his services to Hein. Specifically, the escrow officer testified that she had been involved in several transactions in which Jaynes represented Hein in which he did not receive a commission from the transaction. She testified that Jaynes told her that he would get his payment in the future for what he did for Hein. This course of conduct is substantiated by Hein's purchase of the UTC property which took place at approximately the same time the Bobbitt loan negotiations were proceeding. In the UTC transaction, Hein testified that Jaynes procured financing for Hein from La Jolla Bank & Trust after Hein lost his first loan commitment during the escrow. Jaynes did not receive his compensation for procuring the lender from the loan proceeds when Hein purchased the UTC property in May 1980, but received his compensation consisting of a 10% interest in the

UTC property two and one half years later, when Hein sold the property in November 1982.

This court finds that the Bobbitt loan to Hein was made for the primary purpose of preserving the equity in the Cuyamaca parcel thereby allowing that escrow to close. The closing of the Cuyamaca parcel escrow and possibly the closing of the Broadway and Main property escrow would have produced compensation to Jaynes. Further, the court finds that Jaynes expended substantial time in procuring the Bobbitt loan and that his activities amounted to negotiating and/or arranging the loan for Hein. Unlike the broker in *In re Lara* Jaynes acted exclusively as Hein's agent in negotiating and arranging the Bobbitt loan.

The Bobbitt loan was, in effect, interim financing obtained to protect Hein's equity in the Cuyamaca parcel. Under these circumstances, it is reasonable to infer that Jaynes regarded the Bobbitt loan as an interim or "bridge" loan which was related to the Hein to Pancheri sale of the Cuyamaca parcel.

This court is not persuaded by Hein's argument that the Court of Appeal's holding in *In re Lara* limits the "expected compensation" to compensation arising out of the proceeds of the loan transaction arranged by the broker. Further, this court's holding appears consistent with California Business and Professions Code § 10131 as amended in 1984 after *In re Lara*. Section 10131, as amended evidences the California Legislature's intent that the form or time of payment of compensation not be considered as an element of the definition of a real estate broker.

### B. *Propriety of the Late Charges.*

The note given by Hein to Bobbitt contains the following provision:

"Payor agrees to pay a late charge of $500.00 per day for each installment received after its due date...."

The due date for the first interest installment under the Note was June 26, 1981. However, when the senior note matured on October 6, 1980, and foreclosure proceedings were instituted for its collection, Bobbitt, in late 1980, declared all sums due under the Hein note immediately due and payable by reason of Hein's default on the senior note. Bobbitt paid off the senior note on February 11, 1981 and noticed his foreclosure sale on the Hein note for March 18, 1981. On March 17, 1981, Hein instituted his Chapter 11 proceeding.

Hein contends that the $500.00 per day late charge provision on the promissory note is unreasonable and unenforceable as a penalty.

Prior to July 1, 1978, there was a tendency on the part of the California Courts to severely limit the use of liquidated damage provisions in contracts and agreements. Under former California Civil Code §§ 1670 and 1671, a liquidated damage clause was presumptively invalid unless the damages that arose from the breach would be difficult to ascertain. The proponent of the liquidated damage clause in an agreement executed before July 1, 1978 had the burden of proving three foundational facts:

(1) An agreement between the parties;

(2) Impracticability or extreme difficulty in fixing actual damages; and

(3) A reasonable endeavor to agree on an amount bearing a reasonable relationship to actual damages. *Barbera v. Sokol,* 101 Cal.App.3d 725, 732–733, 161 Cal.Rptr. 843 (1980).

In response to a recommendation of the California Law Revision Commission, the California Legislature in 1977 enacted § 1671 *et seq.,* which became effective July 1, 1978. Under this new legislation, three major categories of agreements containing liquidated damage clauses were recognized, each with its own set of requirements for determining their validity.

California Civil Code § 1671(b) is determinative of whether late charge provisions that liquidate damages for breach of contract are valid or not. The section states in pertinent part that:

"(b) ..., a provision in a contract liquidating the damages for the breach of the

contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." *Cal.Civ. Code* § 1671(b) (West 1985).

In determining whether the late charge provision is valid, the Law Revision Commission Comment to the 1977 Amendment lists six factors to consider.

1) The relationship that the damages provided for in the contract bear to the range of harm that could reasonably be anticipated at the time the contract was made;

2) Relative equality of bargaining power;

3) Whether the parties were represented by counsel;

4) The anticipation of the parties that proof of actual damages would be costly or inconvenient;

5) If the liquidated damage provision is included in a form contract; and

6) Difficulty of proving causation and foreseeability.

*Cal.Civ.Code* § 1671(b), Law Revision Commission Comment (West 1985).

Additionally, the Commission Comments, "... [T]he burden of proof on the issue of reasonableness is on the party seeking to invalidate the provision. Further, reasonableness is determined at the time the contract was made and all circumstances are considered in determining unreasonableness."

*Cal.Civ.Code* § 1671(b), *id.*

Hein contends, and his contention is supported by Bobbitt's testimony, that the late payment provision was added to the note specifically and solely to ensure prompt payment by Hein. Bobbitt's attorney, Gant, further indicated in his testimony that there was practically no discussion between himself and Jaynes concerning amount of the late charges or the relationship of the amount to the anticipated damages in the event of default. Bobbitt testified that Gant had originally suggested $250.00 a day but that he arrived at $500.00 a day since the money was pension money

and that he wanted the $500.00 a day late charges "to keep Hein's attention".

Hein argues that at $500.00 a day, late charges would amount to $182,500 for one year or a little bit more than 38% of the $475,000 principal amount of the Note. If the late charges are calculated for the entire two year term of the Note they equal $365,000 or 76% of the $475,000 principal.

In support of his contention, Hein relies on *Sybron Corp. v. Clark Hosp. Supply Corp.*, 76 Cal.App.3d 896, 143 Cal.Rptr. 306 (1978). In *Sybron Corp.* the court found that a liquidated damage clause which amounts to a 38% increase in the debt was a penalty and was therefore unenforceable. The court went on to state that:

"[S]ince damages for the withholding of money are easily determinable—i.e., interest at prevailing rates—penal provisions for mere delay in the payment of money are not ordinarily enforceable. Civ.Code, § 3302; *Knight v. Marks* (1920) 183 Cal. 354, 357 [191 P. 531].)"

*Sybron Corp.*, 76 Cal.App.3d at 900, 143 Cal.Rptr. 306.

Hein contends that damages under a loan arrangement are obviously easily determinable because the principal and applicable interest rate are contained in the note itself.

In this case, although Bobbitt was represented by Gant, Hein was represented by an experienced real estate broker who also had a law degree. But more importantly, damages in the event of breach are provided for in the note.

Additionally, Hein argues that even if the late charge was valid it cannot be enforced in this case because California Civil Code § 2954.5 requires a lender to notify the borrower in writing that it has 10 days from the mailing of such a notice to cure any delinquency on an obligation before late charges may be assessed. Specifically, the statute states in pertinent part:

(a) Before the first default, delinquency, or late payment charge may be assessed by any lender on a delinquent payment of a loan ... and before the

borrower becomes obligated to pay such a charge, the borrower shall either (1) be notified in writing and given at least ten days from the mailing of such notice in which to cure the delinquency, or (2) be informed, by a billing or notice sent for each payment due on the loan, of the date after which such charge will be assessed.

The notice provided in either paragraph (1) or (2) shall contain the amount of such charge or the method by which it is calculated.

.     .     .     .     .

(e) The failure of the lender to comply with the requirements of this section does not excuse or defer the borrower's performance of any obligation incurred in the loan transaction, other than his *or her* obligation to pay a late payment charge, nor does it impair or defer the right of the lender to enforce any other obligation including the costs and expenses incurred in any enforcement authorized by law. *Cal.Civ.Code* § 2954.5 (West Supp.1986).

By order of this court dated October 9, 1984, Hein's Motion to amend his Complaint to include Hein's legal contention that he was excused from paying a late charge under Civil Code § 2954.5(e) was granted, thus bringing this issue properly before the court. It is undisputed that at no time either before or subsequent to the Chapter 11 case did Bobbitt make any demand for late charges in accordance with Civil Code § 2954.5.

(1) *Estoppel, Unclean Hands and Res Judicata.*

■ Bobbitt argues that Hein is estopped from asserting his failure to send the delinquency notice required by Civil Code § 2954.5. Bobbitt argues that Hein's failure to object to the late charges during the relief from stay proceeding and the fact that Hein, in response to written interrogatories in this adversary proceeding, did not raise the defense of Bobbitt's failure to send a delinquency notice as required under the Civil Code estopped Hein from raising the defense at this time. This court finds that the argument is without merit.

California Civil Code § 2954.5 clearly provides that in order for a lender to assess late charges the lender must comply with the notice requirements contained therein, otherwise the lender cannot collect a late payment charge. Further, this court determines that the matter of the validity of late charges never became an issue in the relief from stay proceeding. Further, despite the fact that Hein's answer to Bobbitt's interrogatories given on or about July 23, 1982, was incomplete and did not raise the "notice" issue, this court does not view that factor as estopping Hein from raising the defense at this time, particularly in view of the Bankruptcy Court's Order of October 9, 1984 allowing Hein to amend his Complaint to raise the issue.

Further, under the doctrine of equitable estoppel, the California Courts have held that four elements must be established:

(1) The party to be estopped must know the facts;

(2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has the right to believe it so intended;

(3) The latter must be ignorant of the true facts; and

(4) The latter must rely on the form of conduct to his injury. *Sawyer v. County of Sonoma,* 719 F.2d 1001, 1006 n. 12 (9th Cir.1983); *City of Longbeach v. Mansell,* 3 Cal.3d 462, 489, 91 Cal.Rptr. 23 (1970).

In the instant case, Bobbitt fails to satisfy, at the very least, the last two elements of equitable estoppel. Specifically, Bobbitt cannot claim that he was ignorant of the true facts since he knew he had not sent the written notice of the delinquency. Moreover, Bobbitt is presumed to know the requirements of California Civil Code § 2954.5. Further, the evidence does not support the forth element that Bobbitt relied on any conduct of Hein to his injury. Bobbitt simply failed to give the required notice to Hein of the delinquency and of

the fact that late charges would be assessed.

■ Bobbitt additionally argues that if he had tendered notice to Hein then he would have been in contempt of the Bankruptcy Court for violating the automatic stay which is in effect by virtue of 11 U.S.C. § 362. The court does not find this argument compelling either, since Bobbitt, as Hein argues, simply could have amended his relief from stay complaint at any time during its pendency to obtain permission from the Bankruptcy Court to allow Bobbitt to give Hein the written notice required by Civil Code § 2954.5.

■ Accordingly, this court finds that under the facts in this transaction and California Civil Code § 1671(b), the late charge is a penalty and is unenforceable and further finds that Bobbitt failed to comply with the requirements of California Civil Code § 2954.5.

### C. *Propriety of Lost Opportunity Damages.*

Bobbitt next argues that should this court find the late charge provision of his Note to be unenforceable then he is entitled to recover damages for lost investment opportunity due to the automatic stay preventing him from repossessing his collateral. More specifically, Bobbitt argues that during the interim period between the imposition of the automatic stay upon the filing of the Chapter 11 proceeding on March 17, 1981 and the payment of the undisputed portion of the amount of the loan, he lost the opportunity to invest in qualified Treasury Notes at a much higher interest rate than was available on November 10, 1982 when the payment was actually made. Relying on the holding of the Court of Appeals, for the Ninth Circuit in *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984), Bobbitt contends that he is entitled to the value of this "lost opportunity", being the interest differential on the interest he received on November 10, 1982 on the undisputed portion of the interest that was actually paid to him. Bobbitt argues therefore that he

has been damaged to the extent that he lost interest on higher yielding investments available at the time when he should have received cash from Hein when those sums were due under the promissory note. In support of his damage claim, Bobbitt, over objection of relevancy, introduced evidence that Bobbitt had an established business practice of making investments in interest bearing loans or securities for the purpose of maximizing return on investments while insuring growth and protection of his company's pension trust res. Bobbitt then produced substantial evidence relating to yields in long term secured interest bearing investments such as 4 year or 7 to 10 year Treasury Notes. Bobbitt therefore argues that he is entitled to recovery of "lost opportunity" as a form of adequate protection pursuant to *In re American Mariner Industries, Inc.*

Bobbitt also contends that had he received late charges as called for under the note from Hein on a timely basis he would have had the same return on the investment opportunity he lost. According to his calculations and the evidence produced at trial Bobbitt sustained present damages of $523,450.37 plus future damages of $47,-835.96 for total of $571,291.33. Since this court has disallowed the late charges under the promissory note as a penalty, the court has not considered Bobbitt's damage argument in this regard.

In summary, therefore, Bobbitt argues that he should be compensated on the basis of his ability to reinvest the proceeds of a foreclosure relating to the defaults as they occurred. The evidence submitted by Bobbitt amounts to, in effect, a present value analysis of the monies that he should have received from Hein under the Promissory Note.

Hein argues that Bobbitt's reliance on *In re American Mariner Industries, Inc.* is misplaced and points out that the factual scenario and the court's holding in that case were limited to the rights of an undersecured creditor only. Hein brings to

this court's attention the statement of the Court of Appeals that:

"The sole issue is whether an undersecured creditor who is stayed by a bankruptcy petition from repossessing his collateral is entitled, under the concept of 'adequate protection', 11 U.S.C. §§ 361, 362, to compensation for the delay in enforcing its rights against the collateral."

*In re American Mariner*, 734 F.2d at 427.

Hein also cites *In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr.S.D. N.Y.1984) (hereinafter *"In re MFPC"*) in further support of his position. In *In re MFPC* the debtor filed its plan of reorganization, which provided *inter alia* deacceleration of long term secured loans pursuant to Code § 1124(2). In *MFPC*, the long term lenders contended that under § 1124(2)(C) they were entitled to compensation for the "lost opportunity costs" of defaulted loan payments. The long term lenders in *MFPC* argued, just as Bobbitt in this proceeding does, that "lost opportunity cost" represents compensation for the loss of the use of the installment payments which, but for the debtor's defaults, would have been paid to the lenders and reinvested by them at current interest rates. The Bankruptcy Court in *MFPC*, however, found that:

[T]his 'loss' is not the type of compensatory damages contemplated by § 1124(2)(C). The compensation which Section 1124(2)(C) considers clearly must arise out of *reasonable reliance* by a creditor on a contractual provision or other related law. The long-term lenders have not shown that the subject loan agreements provide for interest at the market rate, but merely decry the fact that the rate of interest they bargained for is inadequate in today's market.

*In re MFPC*, 43 B.R. at 301.

Accordingly, the court in *MFPC* found that the contractual interest rate, and not the market rate, was the correct rate of interest to be paid by *MFPC* on arrearages to long term lenders.

The Bankruptcy Court in *MFPC* commented in a footnote on the Ninth Circuit Court of Appeals decision in *In re American Mariner Industries, Inc.* by stating that:

This Court feels that the standard of adequate compensation enunciated by the Ninth Circuit for secured creditor protection under Code § 362 is clearly inapplicable in the context of deacceleration under Section 1124, because in the latter situation the secured creditor is indeed receiving the benefit of his original bargain and is in fact no worse off then he would have been in the absence of a bankruptcy filing.

*In re MFPC*, 43 B.R. at 302 n. 7.

Although Hein did not file a Plan of Reorganization in this proceeding it has been stipulated that the sale of the UTC property generated sufficient funds to pay all creditors of this estate in full. Further, on or about November 10, 1982, Bobbitt received his principal payment of $475,000, interest on his Promissory Note at the rate of 18% per year from June 26, 1980 to November 10, 1982 amounting to $202,825 and repayment of principal and interest advanced by Bobbitt on the second superior trust deed. Further, sufficient funds are being held in escrow to pay Bobbitt the extra 2% interest he is entitled to from June 22, 1980 until date of payment. Therefore, Bobbitt, like the secured lenders in *MFPC*, will receive the benefit of his original bargain less, of course, the unenforceable $500.00 a day late charges.

Further, the Findings of Fact and Conclusions of Law in Bobbitt's relief from stay adversary proceeding dated May 12, 1982, found that Bobbitt was adequately protected "at least until June 26, 1982." Thereafter, the parties entered into the stipulation whereby the UTC property was allowed to close thereby providing sufficient funds to pay the undisputed portion of Bobbitt's loan on or about November 10, 1982. There is nothing in the Bobbitt relief from stay adversary proceeding to indicate that this court ever found that Bobbitt's position was ever undersecured.

■ Under California Civil Code § 3302, the payee under an obligation to pay money only, such as the Bobbitt promissory note, is permitted to recover the amount due by the terms of the obligation with interest thereon. Bobbitt is therefore entitled to recover an additional 2% interest under the promissory note, being the difference between the 18% interest previously received by Bobbitt on or about November 10, 1982 and the 20% interest rate specified under the terms of the note. This 2% from June 26, 1980 to November 10, 1982 amounts to $22,565.75.

This court therefore finds the factual situation in this adversary proceeding more analogous to that in *In re Manville Forest Products Corp.*, and finds that the contract rate of 20% annual interest as set forth in Bobbitt's note, and not the lost opportunity cost derived from investments in Treasury Notes, is the correct rate of interest to which Bobbitt is entitled.

### D. *Attorneys' Fees and Costs.*

■ Both parties have indicated that they believe they are entitled to be awarded attorneys' fees and costs.

The promissory note contains a provision granting to Bobbitt reimbursement for any attorneys' fees concerning enforcement of his rights under the note. Such reimbursement clauses are valid under California law. See *In re Sonoma V*, 23 B.R. 789, 796 (Bankr. 9th Cir.1982). *Erich v. Granoff*, 109 Cal.App.3d 920, 931, 167 Cal.Rptr. 538 (1980). However, under the terms of California Civil Code § 1717, this unilateral contract right to attorney's fees is transferred into a reciprocal provision giving the right to recover to either party. *International Industries, Inc. v. Olen*, 21 Cal.3d 218, 223, 145 Cal.Rptr. 691, 577 P.2d 1031 (1978); *Care Constr., Inc. v. Century Convalescent Centers, Inc.*, 54 Cal.App.3d 701, 705, 126 Cal.Rptr. 761 (1976).

Hein claims that he is the prevailing party since the final judgment to be issued in this litigation will be in his favor for a substantial sum. See *Teichner v. Klassman*, 240 Cal.App.2d 514, 524, 49 Cal.Rptr.

742 (1966); *Hughes Tool Co. v. Max Hinrichs Seed Co.*, 112 Cal.App.3d 194, 203, 169 Cal.Rptr. 160 (1980).

On November 1, 1982, shortly before the sale of the "UTC property", this court ordered in the relief from stay adversary proceeding that a sum be placed in escrow in an interest bearing account in sufficient amount to satisfy Bobbitt's claim to the disputed interest rate for the period of June 26, 1980 through November 10, 1982, and his claim to the disputed late charges of $500 per day for the period June 27, 1981 to November 10, 1982, and his claim for attorney's fees. That sum was determined to be $300,000 and that amount was placed in escrow and remains subject to further order of this court.

Additionally, on or about November 10, 1982, pursuant to court Order, Bobbitt was paid the sum of $202,825 representing interest on the Bobbitt note at 18% per year from June 26, 1980 to November 10, 1982. If Hein had prevailed on the usury issue, then under California law as previously described, all of the interest paid or to be paid to Bobbitt would have been void. By virtue of this court's ruling on the usury issue, Hein is not the prevailing party on this issue and Bobbitt will be entitled to retain the sum of $202,825 previously paid to him on November 10, 1982.

However, Hein has prevailed on the issue that the $500 per day late charges imposed by the note are unenforceable as a penalty under California law. The amount of late charges requested by Bobbitt are $250,500. In the alternative, to the late charge damages, Bobbitt argued that he was entitled to damages for the lost opportunity to invest sums, that he should have been paid by Hein under the note, in long term securities at relatively high interest rates, as was his established business policy, pursuant to the Ninth Circuit Court of Appeal's opinion in *In re American Mariner Industries, Inc.* This court has denied Bobbitt's request for late charge damages and his alternative request for lost opportunity damages.

Since Bobbitt has prevailed on the issue of the usurious interest rate, he will receive an additional $22,536.11 in interest out of the $300,000 held in the interest bearing account in order to raise his return on the promissory note from 18% per annum to 20% per annum as stated in the note, for the period June 26, 1980 to November 10, 1982. In addition, Bobbitt will receive actual expenses in the administration of the loan account in the sum of $3,552.00, which sum is not disputed by Hein.

Bobbitt is also entitled to receive the sum of $13,075.44 previously awarded Bobbitt on September 23, 1981 at a continued hearing on the relief from stay proceeding. Bobbitt requested payment of this sum in this proceeding since the obligation was not paid by Hein to Bobbitt. The sum represents reimbursement of lost interest earnings on the sums that American Electric advanced to the pension trust in order to cure the senior note on the Broadway and Main real property. Additionally, the Bankruptcy Court awarded Bobbitt interest at the rate of 19½% on the $13,075.44 for the period of June 29, 1981 to November 10, 1982. This interest amounts to $3,485.77.

The amounts incurred by both sides for fees and costs appear to be comparable. Further, it appears that each party has prevailed on a major issue in this case which has resulted in what amounts to an offset in damages. Therefore, this court finds that neither party is the "prevailing party" within the meaning of California Civil Code § 1717 and thus, each party will bear its own fees and expenses.

### IV.

### CONCLUSION

1. The loan was not usurious as the loan was arranged by a California licensed real estate broker within the meaning of California Constitution article 15, § 1(2) and California Civil Code § 1916.1.

2. Bobbitt is entitled to an additional 2% interest on the promissory note for the period June 26, 1980 to November 10, 1982, which sum amounts to $22,565.75.

3. Bobbitt is entitled to an additional $13,075.44 representing interest paid by the trust to AECC for lost interest earnings on sums AECC advanced the trust to cure the senior trust deed on the Broadway and Main property.

4. Bobbitt is also entitled to interest at the rate of 19½% on the $13,075.44 for the period June 29, 1981 and November 10, 1982, since this sum, although not paid by Hein on November 10, 1982, was previously awarded Bobbitt by a ruling by the court on September 23, 1981 in relation to the relief from stay litigation.

5. The late charge provision in the promissory note in the sum of $500 per day for each installment received after its due date is an unenforceable penalty under California Civil Code § 1671(b).

6. Bobbitt is entitled to actual expenses in the administration of the loan account in the sum of $3,552.00. Bobbitt is not entitled to "lost opportunity damages". In a case for declaratory relief and for damages under contract, damages arising under the contract are governed by California Civil Code § 3302. The holding in *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984) regarding "lost opportunity damages" is limited to adequate protection issues involving an undersecured creditor raised at relief from stay proceedings under 11 U.S.C. §§ 361 and 362.

7. Neither party was the "prevailing party" in this proceeding. Therefore, each party will bear its own fees and costs.

8. This Memorandum Opinion shall constitute findings of fact and conclusions of law as required by Bankruptcy Rule 7052. Counsel for plaintiff shall prepare and lodge an appropriate proposed Order within 10 days from the filing of this decision.